STEEL MANUFACTURERS
ASSOCIATION,
Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

International Mill Service, American Iron
and Steel Institute, Zinc Corporation of
America, Horsehead Resource Develop-
ment Company, Inc., and Hazardous
Waste Treatment Council, Intervenors.

Nos. 91–1538, et al. (COMPLEX).

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 28, 1994.

Decided July 8, 1994.

John N. Moore, Washington, DC, argued the cause, for petitioner. With him on the joint brief for consolidated industry petitioners were Paul E. Gutermann, Karl S. Bourdeau, Aaron H. Goldberg, John L. Wittenborn and William M. Guerry, Jr., Washington, DC. On the brief for intervenor Hazardous Waste Treatment Council were David R. Case and Eli D. Eilbott, Washington, DC.

Robin L. Juni, Atty., U.S. Dept. of Justice, and Steven E. Silverman, Council, U.S. E.P.A., Washington, DC, argued the cause, for respondent. With Robin L. Juni on the brief was Michael A. McCord, Atty., U.S. Dept. of Justice, Washington, DC. Daniel S. Goodman, Washington, DC, entered an appearance.

Before: MIKVA, Chief Judge, SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the court filed PER CURIAM.

PER CURIAM:

These consolidated petitions for review challenge a final rule promulgated by the Environmental Protection Agency ("EPA" or "agency") under the authority of section 3004 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6924 (1988). The rule, entitled "Land Disposal of Electronic Arc Furnace Dust (K061)," 56 Fed.Reg. 41,-164 (Aug. 19, 1991), establishes numerical treatment standards for thirteen metals contained in residual slag after hazardous waste K061 is processed in high temperature metals recovery ("HTMR") facilities. Representatives of the iron and steel industry assert that the final rule fails to provide a reasoned explanation for the agency's assertion of authority to regulate contaminant levels in K061 slag. Petitioners also contend that EPA acted arbitrarily and capriciously and contrary to RCRA by establishing a treatment standard for zinc, which the agency does not currently consider a "hazardous constituent."

We hold that EPA adequately explained its decision to bring K061 slag within the regulatory scope of RCRA. The agency met its explanatory burden by adopting this court's position in *American Petroleum Institute v. EPA,* 906 F.2d 729 (D.C.Cir.1990), that regulating K061 slag furthers the "cradle to grave" regulatory philosophy established in the RCRA statute and is consistent with prior agency rules. We also conclude that the agency's decision to set a zinc treatment standard was authorized by RCRA and sup-

ported by evidence in the record. Accordingly, we deny the petitions for review.

## I. STATUTORY AND REGULATORY BACKGROUND

### A. Hazardous Waste Management under RCRA

Subtitle C of RCRA, 42 U.S.C. §§ 6921–39b (1988), "directs EPA to establish a comprehensive 'cradle to grave' system regulating the generation, transport, storage, treatment and disposal of hazardous wastes." *Chemical Waste Management, Inc. v. Hunt,* — U.S. —, — n. 1, 112 S.Ct. 2009, 2011 n. 1, 119 L.Ed.2d 121 (1992). The hazardous wastes subject to this comprehensive management scheme include any:

> solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may ... cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or ... pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5).

RCRA defines "solid waste" to include "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material...." *Id.* § 6903(27). The Act does not specify what characteristics of a waste render it hazardous to human health or the environment; instead, it directs EPA to "develop and promulgate criteria for identifying the characteristics of hazardous waste, and for listing hazardous waste ... taking into account toxicity, persistence, and degradability in nature, potential for accumulation in tissue, and other related factors such as flammability, corrosiveness, and other hazardous characteristics." *Id.* § 6921. Pursuant to this directive, EPA has adopted a two-track scheme for identifying hazardous wastes. So-called "characteristic wastes," regulated under 40 C.F.R. §§ 261.20–.24, exhibit at least one of four specified characteristics: ignitability,

corrosivity, reactivity, or toxicity. Such wastes are deemed automatically subject to regulation under RCRA subtitle C, *American Petroleum Instit. v. EPA,* 906 F.2d 729, 733 (D.C.Cir.1990) ("*API* "), and retain the designation of hazardous waste until they cease to exhibit any of the characteristics. *See* 40 C.F.R. § 261.3(d)(1).

The other type of hazardous wastes, "listed wastes," comprises wastes specifically classified as hazardous by EPA rule. *See* 40 C.F.R. § 261.11 (setting out criteria EPA considers in determining whether a solid waste should be listed as a hazardous waste). Under EPA regulations, a listed hazardous waste retains that classification, even if has been treated in some fashion, until the waste has been demonstrated to be no longer hazardous. *See* 40 C.F.R. § 261.3(c)–(d) (the "derived-from" rule).

Once a waste has been listed by EPA, RCRA permits its disposal on the land if the waste has been treated to meet standards established by EPA pursuant to 42 U.S.C. § 6924(m). Section 6924(m)(1) instructs EPA to "specify[ ] those levels or methods of treatment, if any, which substantially diminish the toxicity of the waste or substantially reduce the likelihood of migration of hazardous constituents from the waste so that short-term and long-term threats to human health and the environment are minimized." EPA has concluded that requiring hazardous wastes to be treated in accordance with the best demonstrated available technology ("BDAT") is sufficient to satisfy this criterion. *See* 51 Fed.Reg. 40,572, 40,578 (1986).

The 1984 amendments to RCRA establish a strict timetable for the promulgation of specific treatment standards for the land disposal of hazardous wastes. Under the amendments, Congress required EPA to divide hazardous wastes into three categories based on their intrinsic hazardousness and annually generated volumes and then to adopt treatment standards for such wastes. *See* 42 U.S.C. § 6924(g). If treatment standards were not in place for any waste on the list by May 8, 1990, a statutory "hard hammer" would fall, precluding any land disposal of the waste in question. *See* 42 U.S.C. § 6924(g)(6)(C).

## B. Treatment Standards for K061 Electric Arc Furnace Dust

Electric arc furnace dust, which is also known by its hazardous waste designation code "K061," is collected by emission control devices when steel is manufactured. EPA listed K061 as a hazardous waste under RCRA primarily because it contains high concentrations of hexavalent chromium, lead, and cadmium. However, K061 also contains substantial quantities of other metals, including antimony, arsenic, barium, beryllium, mercury, nickel, selenium, silver, thallium, vanadium, and zinc.

Some of those metals can be extracted from K061 dust, and the mobility of the other metals can be limited, by subjecting the dust to high temperature metals recovery ("HTMR"). High concentrations of valuable metals such as zinc create strong incentives for steel manufacturers and others to reprocess K061 dust. EPA estimates that approximately 90% of high-zinc K061 currently is reprocessed using HTMR and that most of this metals recovery is performed by commercial facilities designed for that purpose. See 56 Fed.Reg. 15,020, 15,025 (1991). Once the valuable metals have been extracted from K061 dust, the rock-like slag product that remains is also put to further use, principally as road base material in highway construction, or as an anti-skid material applied directly to road surfaces. See id. at 15,024.

In its First–Third rulemaking, 53 Fed.Reg. 31, 138 (1988), EPA identified HTMR as the BDAT for treatment of high-zinc K061 hazardous wastes because it believed that mandatory recycling of recoverable metals would reduce the amount of hazardous wastes ultimately treated and disposed. See API, 906 F.2d at 734. However, EPA declined to extend its treatment standards to K061 slag residues. EPA noted that HTMR furnaces used for metals recovery " 'are normally ... essential components of the industrial process ... [and] involved in the very act of production, an activity normally beyond the Agency's RCRA authority.' " Id. (quoting 53 Fed.Reg. 11,753 (1988)). Relying on its "indigenous principle," which stated that "[a] secondary material burned in an industrial furnace exclusively for materials recovery is

not a solid ... waste ... if it is indigenous to the process in which the industrial furnace is used, in the sense of being generated by the same type of industrial furnace as that in which burning occurs," 52 Fed.Reg. 16,982, 17,034 (1987), EPA concluded that it had no jurisdiction over K061 slag residues under RCRA. According to EPA, "K061 ceases to be a 'solid waste' when it arrives at a metals reclamation facility because at that point it is no longer 'discarded material.' " API, 906 F.2d at 740.

This court reversed and remanded the K061 rule to EPA in American Petroleum Institute v. EPA, 906 F.2d 729 (D.C.Cir. 1990). The court explained that neither caselaw nor RCRA unambiguously foreclosed EPA's power to prescribe treatment standards for K061 slag, id. at 740–41, and that by declining to regulate on that basis the EPA had unlawfully exempted K061 slags from RCRA's land disposal provisions. Id. at 741. The court also made clear that "the scope of the agency's interpretive discretion on remand is far from unbounded," and any decision not to extend treatment standards to K061 slag would have to be reconciled with RCRA's cradle-to-grave regulatory structure and EPA's derived-from rule. Id. at 741–42.

On remand, EPA adopted the final rule that is the subject of this appeal. See Land Disposal Restrictions for Electric Arc Furnace Dust (K061), 56 Fed.Reg. 41,164 (1991). The rulemaking established concentration-based treatment standards for high-zinc K061 dust and identified permissible quantities of thirteen metals in K061 dust following HTMR, although not all of these metals (in particular, zinc) are currently listed as "hazardous constituents" under RCRA. See 56 Fed.Reg. at 41,167–70.

EPA also specified that K061 slag residues from HTMR would be subject to the treatment standards established in the rule. See 56 Fed.Reg. at 41,165. The agency first acknowledged the need to act promptly, given the possibility that K061 residues might be subject to a complete land ban under RCRA's hard-hammer provisions due to the pending lapse of existing treatment standards for K061 on August 8, 1991. Id. While EPA noted that it was engaged in a

"comprehensive reevaluation of its rules" regarding the solid waste status of recycled materials such as K061, it concluded that it would defer to later rulemakings "any definitive determination on some of the broader issues ... regarding which materials are and are not solid wastes when destined for recycling." *Id.* EPA accordingly stated its intention to retain "existing Agency rules" that "K061 destined for metals reclamation is a solid waste ... [and n]on-product residues from the metals reclamation process remain hazardous wastes under the K061 code by virtue of the derived-from rule in 40 C.F.R. 261.2(c)(3)." *Id.* The agency further noted that "[t]o the extent that it is ... necessary ... to address the policy implications of preserving the regulatory status quo, ... this result is consistent with RCRA's cradle-to-grave mandate in that there will be strict supervision of toxic constituents from K061 throughout all phases of its management." *Id.* at 41,165–66.

Numerous parties to the rulemaking petitioned this court for review. Petitioners Hazardous Waste Treatment Council and Natural Resources Defense Council challenge as arbitrary and capricious EPA's decision to extend its "generic delisting" criteria only to K061 slags destined for a title D landfill, rather than to slag residue products as well. However, argument on these issues was stayed by order of the court pending settlement negotiations and accordingly will not be considered herein. The arguments of petitioner International Mill Service, Inc. are similarly not before the court because we granted its motion to voluntarily dismiss its petition for review. Thus, we consider only the claims of the consolidated industry petitioners, who argue that applying treatment standards to K061 slag residues is arbitrary and capricious and inconsistent with the *API* court's instructions on remand, and that adoption of a zinc treatment standard violates RCRA and is arbitrary and capricious.

## II. DISCUSSION

### A. *K061 Slag Treatment Standards*

■ Judicial review of regulations promulgated under RCRA is governed by the Administrative Procedure Act ("APA"). 42

U.S.C. § 6976(a). Under the APA, we must set aside agency rules that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In assessing whether agency decisions are arbitrary and capricious, we afford the agency significant leeway. We do not substitute our judgment for that of the agency; we require only that the agency's decisions reflect reasoned decisionmaking based on evidence in the record.

In *API*, we held that because K061 itself is "indisputably 'discarded' before being subject to metals reclamation," EPA could not disavow its authority to regulate K061 slag by reliance on our decision in *American Mining Congress v. EPA,* 824 F.2d 1177 (D.C.Cir. 1987), which held that RCRA does not apply to *non-discarded* materials used in ongoing industrial processes. *API,* 906 F.2d at 741. While recognizing RCRA's jurisdictional bar against regulating non-discarded materials, *API* in effect rejected EPA's use of the "indigenous principle" as a rational means of distinguishing discarded wastes from non-wastes. EPA was thus left with two choices on remand: It could have again refused to regulate K061 slag under a reconstituted indigenous principle; or, as the court strongly urged, it could have set K061 slag treatment standards based on the existing "derived from" rule. *See* 40 C.F.R. § 261.3(c)(2)(i) (defining hazardous waste to include "any solid waste generated from the treatment ... of a hazardous waste"). Petitioners do not challenge EPA's reading of its own rules, and in *API* we noted that under those rules "it would appear EPA must prescribe treatment standards for the disposal of K061 slag." *API,* 906 F.2d at 742. EPA chose the latter course, but noted that it was doing so only in the interim to avoid the "hard hammer" of an absolute ban on K061 slag disposal should EPA's existing treatment standards lapse. Because of this exigency, the agency deferred making "any definitive determination on some of the broader issues raised by the court's opinion regarding which materials are and are not solid wastes when destined for recycling." 56 Fed.Reg. at 41,165.

■ We are satisfied that EPA's course was reasoned and proper. Initially, we do

not share petitioners' view that in establishing K061 slag treatment standards, EPA "abandon[ed] its longstanding prior rule not to intrude into production processes," and therefore was required to provide greater than customary justification for the final rule. *See Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does act in the first instance."). EPA did not "abandon" the view expressed in *AMC I* that materials used in ongoing production processes are not subject to RCRA. Rather, the agency jettisoned only the indigenous principle as the method of determining whether or not a material is a component of the production process. The agency believed, and we agree, that this result was a natural consequence of our decision in *API.* Read correctly, *API* held that the indigenous principle was not the product of reasoned decisionmaking and that EPA therefore could not rely on the principle in exempting K061 slag from RCRA land disposal restrictions. *API* at 740. As the agency chose on remand not to attempt another justification for its nonregulation, but rather to set K061 slag standards, its only burden was to explain why treatment standards are consistent with both the derived-from rule and the broad purposes of RCRA. EPA was under no obligation to explain why the indigenous principle, which we rejected and which it abandoned, no longer applied. The agency clearly met its burden. *See* 56 Fed.Reg. at 41,165 (stating that "K061 waste destined for reclamation via HTMR is a solid waste under [the derived-from rule] because it is a listed waste being reclaimed ... and because at present there is no indigenous principle operating to cut off application of the derived-from rule."); *id.* at 41,165–66 (noting that K061 slag treatment standards are "consistent with RCRA's cradle-to-grave mandate in that there will be strict supervision of toxic constituents from K061 throughout all phases of its management ...").

RCRA's jurisdictional bar against regulating the production process still stands, and as EPA acknowledged in its final rule, the agency is currently engaged in making "waste/non-waste determinations" that will bear on the classification of recycled materials such as K061 slag. 56 Fed.Reg. at 41,165. Until such definitive determinations are made, operation of existing agency rules define the contours of the jurisdictional bar. Accordingly, EPA did not deviate from longstanding policy any more than was required by *API,* and no higher justification for the final rule was necessary.

■ Moreover, we agree with the agency that it had sufficient reasons to issue treatment standards pending completion of new rules concerning recycled materials. As discussed in the statement of facts, the *API* remand created the potential for a "hard hammer" absolute ban on K061 slag land disposal by vacating existing K061 treatment standards and leaving in place only EPA's interim treatment standards for First–Third wastes. The interim standards were scheduled to lapse on August 8, 1991, just over one year after the *API* remand. Had they lapsed without the promulgation of new standards, operation of RCRA section 3004(g)(6)(C) threatened to prevent the land disposal of the approximately 415,000 tons of K061 generated annually in the United States. Such a result effectively would have halted the country's steel production. Confronted with this possibility, it was reasonable for the agency to promulgate new K061 treatment standards without first pursuing the much more difficult and time-consuming task of establishing new discarded/non-discarded criteria for the entire spectrum of hazardous wastes.

Petitioners' contention that the hard hammer would not have fallen at all because RCRA section 3004(g)(6)(C) applies only when EPA fails to promulgate a standard in the first instance, and not when a previously promulgated standard is vacated by court order, misses the mark. Although petitioners' interpretation of section 3004(g)(6)(C) may be defensible, it is enough that EPA reasonably believed that the absolute land disposal ban was imminent. We think EPA's belief was reasonable. First, section 3004(g)(6)(C) does not explicitly address the

status of promulgated treatment standards that are later held invalid. Second, an absolute land disposal ban in such situations is in keeping with Congress' clear intent to have continuing treatment standards in place for the life of the hazardous waste in question. Not imposing the hard hammer in these instances would diminish EPA's incentive to repromulgate vacated standards in a timely manner. Finally, what scant guidance this court has supplied on this issue points in the direction of the agency's interpretation. In *Chemical Waste Management, Inc. v. EPA,* 976 F.2d 2 (D.C.Cir.1992), we stated that Congress "has chosen to enforce [RCRA's statutory deadlines] by decreeing that any hazardous waste that is not covered by a *valid* regulation within the date specified will be denied land disposal." *Id.* at 18–19 (emphasis added). This statement suggests that any gap in valid treatment standards, no matter what its source, will cause the hard hammer to fall. Based on these factors, it was reasonable for EPA to assume that RCRA section 3004(g)(6)(C) would have banned the land disposal of K061 slag had the agency not acted promptly to repromulgate new treatment standards. As it is our practice not to intrude upon an agency's reasonable decisions concerning allocation of its resources and the order in which it conducts business, *see, e.g., In re Barr Laboratories, Inc.,* 930 F.2d 72, 74, 76 (D.C.Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 297, 116 L.Ed.2d 241 (1991); *Sierra Club v. Thomas,* 828 F.2d 783, 797 (D.C.Cir.1987), we uphold the agency's course of action.

### B. The Zinc Treatment Standard

■ As discussed above, EPA's final rule limits concentration levels for thirteen metals, including zinc, found in K061 dust. 56 Fed.Reg. at 41,167–70. EPA promulgated the concentration standards pursuant to RCRA section 3004(m), which directs EPA to:

> promulgate regulations specifying those levels or methods of treatment, if any, which substantially diminish the toxicity of the waste or substantially reduce the likelihood of migration of *hazardous constituents* from the waste so that short-term and

long-term threats to human health and the environment are minimized.

42 U.S.C. § 6924(m)(1) (emphasis added). A separate regulation lists the "hazardous constituents" referred to in section 3004(m). 40 C.F.R. Part 261, appendix VIII. Zinc is not on the list. Petitioners claim that the absence of zinc from the list prohibits EPA from setting zinc treatment standards. We disagree. Employing the familiar analysis of *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we find that petitioners' position is not mandated by the plain directive of § 3004(m), and we therefore bow to the EPA's interpretation of the section, which we find reasonable.

Section 3004(m) authorizes EPA to establish treatment standards "which substantially reduce the likelihood of migration of hazardous constituents." It does not, as petitioners' reading would suggest, command EPA to set standards *for* hazardous constituents that will reduce the likelihood of their migration. Therefore, if setting a treatment standard for zinc "substantially reduces the migration" of materials that *are* listed in Appendix VIII— as EPA claims it does—we see nothing in § 3004(m) that unambiguously prevents EPA from doing so.

■ Petitioners also argue that setting a zinc treatment standard conflicts with a prior agency practice of regulating only Appendix VIII constituents. They locate such a practice in EPA's 1988 decision not to include zinc as a BDAT list constituent for *low*-zinc K061. In fact, however, EPA has in the past regulated non-Appendix VIII constituents, as is evident by zinc's inclusion as a BDAT list constituent for *high*-zinc K061. Accordingly, past agency practice has been inconsistent at best and thus provides us no reason to object to the zinc concentration standard here.

■ Petitioners argue in the alternative that even if a zinc standard is permissible under RCRA, the present one is not supported by evidence in the record and therefore is arbitrary and capricious. We reject this argument as well. EPA established a zinc treatment standard in order to insure proper operation of HTMR processes by

maximizing zinc recovery. The agency found that high zinc recovery lowers both the overall volume of slag and the mobility of toxic metals in the slag residue—results consistent with RCRA's broad goals of minimizing the amount of waste and reducing the likelihood of hazardous materials leaching onto the land. 56 Fed.Reg. at 41,168. Petitioners concede that maximizing zinc recovery would lower the volume of zinc in the slag—and, logically, the overall volume of slag itself—but they dispute EPA's finding that maximizing zinc recovery will reduce the mobility of hazardous constituents.

We conclude that minimizing the overall volume of slag that is to be disposed is, by itself, a sufficient justification for the zinc treatment standard, and therefore we do not reach petitioners' claim that EPA failed to demonstrate that zinc is an accurate predictor of leachate levels of other constituents found in K061 slag. Minimizing the volume of K061 slag—which is a hazardous waste under current EPA regulations notwithstanding the fact that all of its constituents may not themselves be "hazardous"—promotes RCRA's abiding goal of reducing or eliminating the generation of hazardous wastes. *See* 42 U.S.C. § 6902(b) ("The Congress hereby declares it to be the national policy of the United States that wherever feasible, the generation of hazardous wastes is to be reduced or eliminated as expeditiously as possible.").

■ We note, finally, that petitioners' lack of opportunity to comment on one of the agency's rationales for setting the zinc standard is not fatal to the final rule. In the rule, EPA stated that the zinc treatment standard also was designed to abate the leaching of zinc itself, which according to the agency has been found to be an aquatic toxin. 56 Fed.Reg. at 41,168. Petitioners claim that the EPA deprived them of an opportunity to comment on this rationale. They are correct, but because EPA had adequate and independent grounds for setting the zinc standard, *see supra*, its failure to allow comments on the "aquatic toxin" rationale can be excused under the APA's "harmless error" rule, 5 U.S.C. § 706. *See Chemical Mfrs. Ass'n. v. EPA*, 870 F.2d 177, 202, *clarified*, 885 F.2d

253 (5th Cir.1989), *cert. denied*, 495 U.S. 910, 110 S.Ct. 1936, 109 L.Ed.2d 299 (1990) (APA § 706 applies "when a mistake of the administrative body is one that clearly had no bearing ... on the substance of the decision reached.").

### III. CONCLUSION

For the foregoing reasons, we conclude that EPA properly exercised its authority in promulgating its final rule on the land disposal of K061 electronic arc furnace dust. The petitions for review are therefore

*Denied.*