United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued January 19, 2000 Decided August 18, 2000 

 No. 99-1098

 First American Discount Corporation, 
 Petitioner

 v.

 Commodity Futures Trading Commission, 
 Respondent

 On Petition for Review of an Order of the 
 Commodity Futures Trading Commission

 Patrick G. King argued the cause and was on the briefs for 
petitioner.

 C. Maria D. Godel, Attorney, Commodity Futures Trading 
Commission, argued the cause for respondent. With her on 
the brief were David R. Merrill and J. Douglas Richards, 
Deputy General Counsel.

 John J. Muldoon, III was on the brief for amicus curiae 
FCM Coalition for Regulatory Fairness.

 Before: Henderson, Randolph, and Garland, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Garland.

 Separate statement concurring in the judgment filed by 
Circuit Judge Randolph.

 Garland, Circuit Judge: First American Discount Corpo-
ration seeks review of an order of the Commodity Futures 
Trading Commission (CFTC) holding the company jointly and 
severally liable for the acts of a commodities broker whose 
liabilities First American had agreed to guarantee. First 
American contends that the CFTC regulation pursuant to 
which it entered into the guarantee agreement is substantive-
ly and procedurally invalid, and further argues that the 
broker's customer waived the benefits of the guarantee. The 
CFTC rejected these claims, as do we.

 I
 First American is regulated under the Commodity Ex-
change Act (CEA) as a "futures commission merchant" 
(FCM). See 7 U.S.C. s 1a(12).1 An FCM is the commodity 
market's equivalent of a securities brokerage house, soliciting 
and accepting orders for futures contracts and accepting 
funds or extending credit in connection therewith. See Timo-
thy J. Snider, Regulation of the Commodities Futures and 
Options Markets s 6.04 (2d. ed. 1997). Prior to 1982, FCMs 
did business with the public both through their own employ-
ees, known as "associated persons," and through loosely 
__________
 1 The CEA defines an FCM as:
 an individual, association, partnership, corporation, or trust 
 that--(A) is engaged in soliciting or in accepting orders for the 
 purchase or sale of any commodity for future delivery on or 
 subject to the rules of any contract market; and (B) in or in 
 connection with such solicitation or acceptance of orders, ac-
 cepts any money, securities, or property (or extends credit in 
 lieu thereof) to margin, guarantee, or secure any trades or 
 contracts that result or may result therefrom.
 
7 U.S.C. s 1a(12).

affiliated "agents." S. Rep. No. 97-384, at 40 (1982). The 
main function of many such agents was to procure business 
for FCMs. See id. at 111. These agents were largely 
unregistered and unregulated. See id. at 40.

 In 1982, the CFTC advised Congress that the number of 
agents was growing significantly, and that FCMs who used 
them "have often disavowed any responsibility for violations 
of the Act by these 'agents.' " Id. The Commission proposed 
that "each 'agent' of a futures commission merchant be 
required to register as an associated person of that futures 
commission merchant." Id. Congress, however, did not 
adopt the CFTC's recommendation. As the Senate Commit-
tee on Agriculture, Nutrition, and Forestry explained:

 [T]he Committee felt it would be inappropriate to (1) 
 require these independent business entities to become 
 branch offices of the futures commission merchants 
 through which their trades are cleared or (2) to impose 
 vicarious liability on a futures commission merchant for 
 the actions of an independent entity.
 
Id. at 41. At the same time, Congress acknowledged the 
need "to guarantee accountability and responsible conduct of 
such persons," id., who "deal with commodity customers and, 
thus, have the opportunity to engage in abusive sales prac-
tices," id. at 111.

 To resolve this dilemma, Congress drafted legislation re-
quiring all persons who solicit or accept customer orders for 
FCMs to register with the CFTC, but permitting them to 
register either as "associated persons" of the FCMs, or as 
part of a new class of registrants called "introducing bro-
kers." Id. at 112. The latter were conceived of as indepen-
dent entities that solicited and accepted customer orders but 
used the services of FCMs for clearing, record keeping and 
retaining customer funds. See id. at 41. To guarantee the 
accountability of introducing brokers, the Commission was 
authorized to require them to meet "minimum financial re-
quirements." See id.

 The new provisions were enacted as part of the Futures 
Trading Act of 1982, Pub. L. No. 97-444, 96 Stat. 2294, which 
amended the CEA. Most significant for our purposes are 
amended CEA section 1a, 7 U.S.C. s 1a, which creates the 
category of "introducing brokers,"2 and amended section 
4f(b), 7 U.S.C. s 6f(b), which directs the CFTC to ensure that 
every introducing broker "meets such minimum financial 
requirements as the Commission may by regulation prescribe 
as necessary to insure his meeting his obligations as a regis-
trant."3 In adopting the latter, the House Conference Report 
stated:

 [T]he conferees contemplate that the Commission will 
 establish financial requirements which will enable [intro-
 ducing brokers] to remain economically viable, although 
 it is intended that fitness tests comparable to those 
 required of associated persons will also be employed. 
 The intent of the conferees is to require Commission 
 registration of all persons dealing with the public, but to 
 provide registrants with substantial flexibility as to the 
 manner and classification of registration.
 
H.R. Conf. Rep. No. 97-964, at 41 (1982).

 In April 1983, the CFTC responded to Congress' mandate 
by publishing a notice of proposed rulemaking setting forth a 
__________
 2 The statute defines an introducing broker as:

 any person (except an individual who elects to be and is 
 registered as an associated person of a futures commission 
 merchant) engaged in soliciting or in accepting orders for the 
 purchase or sale of any commodity for future delivery on or 
 subject to the rules of any contract market who does not accept 
 any money, securities, or property (or extend credit in lieu 
 thereof) to margin, guarantee, or secure any trades or con-
 tracts that result or may result therefrom.
 
7 U.S.C. s 1a(14).

 3 The amended statute bars registration of an introducing 
broker unless the broker meets the CFTC's minimum financial 
requirements, see 7 U.S.C. s 6f(b), and makes it unlawful to engage 
in business as an introducing broker unless registered as such, see 7 
U.S.C. s 6d.

$25,000 "minimum adjusted net capital requirement" for in-
troducing brokers. 48 Fed. Reg. 14,933, 14,942 (1983) (pro-
posed rule). In addition, those brokers whose capital reserve 
decreased to less than an "early warning level" of 150% of 
that amount would, under the proposed rule, be required to 
notify the CFTC and file monthly financial statements. Id. at 
14,951. The capital requirement, therefore, would effectively 
have been $37,500. See 48 Fed. Reg. 35,248, 35,262 (1983) 
(final rule). The CFTC stated that requiring introducing 
brokers to have such a permanent capital base "not only 
would establish a benchmark of economic viability, but would 
also be an important element of customer protection." 48 
Fed. Reg. at 14,942. The proposed minimum would "pro-
vid[e] coverage for potential liabilities arising from business 
operations, customer relations and the handling of proprie-
tary accounts." Id.

 After publication of the notice, the CFTC received numer-
ous comments, including many from the industry contending 
that the proposed capital requirements were excessive. The 
CFTC issued its final rule on August 3, 1983. The final rule 
took the industry's comments into account by reducing the 
minimum net capital requirement to $20,000 and entirely 
eliminating the proposed early warning requirement for intro-
ducing brokers. See 48 Fed. Reg. at 35,249. In addition, 
adopting the suggestion of several FCMs, the Commission 
announced an alternative method for complying with the 
financial requirement. Under this alternative, an introducing 
broker may satisfy the requirement without maintaining any 
net capital of its own, if it enters into a guarantee agreement 
with an FCM under which the FCM agrees to:

 guarantee[ ] performance by the introducing broker of, 
 and ... be jointly and severally liable for, all obligations 
 of the introducing broker under the Commodity Ex-
 change Act ... with respect to the solicitation of and 
 transactions involving all commodity customer ... ac-
 counts of the introducing broker entered into on or after 
 the effective date of [the] agreement.
 
CFTC Form 1-FR-IB (Part B); see 17 C.F.R. s 1.3(nn); 48 
Fed. Reg. at 35,249.4 The rule became effective on August 3, 
1983.5

 Taking advantage of the alternative compliance mechanism 
contained in the final rule, First American entered into a 
guarantee agreement with Wolf Futures Group, Inc., an 
introducing broker. Pursuant to the new regulations, the 
agreement stated that First American would be jointly and 
severally liable for all of Wolf's obligations as an introducing 
broker under the CEA. See Violette v. First Am. Discount 
Corp., CFTC Doc. No. 97-R020, 1999 WL 92428, at *3 n.1 
(Feb. 24, 1999). Wolf Futures subsequently introduced Greg-
ory Violette to First American to open a commodity futures 
trading account in Violette's name.

 On December 11, 1996, Violette filed a complaint with the 
CFTC against Wolf Futures and its principal, Scott Allen 
Wolf [hereinafter referred to collectively as "Wolf"]. On Au-
gust 31, 1998, a CFTC Judgment Officer found that Wolf had 
traded Violette's account without written authorization in 
violation of CFTC Regulation 166.2, 17 C.F.R. s 166.2. See 
Violette v. First Am. Discount Corp., CFTC Doc. No. 
97-R020, 1998 WL 552810 (Aug. 31, 1998). The Officer 
assessed damages of $13,438.50, plus prejudgment interest 
and costs. Most significant for our purposes, the Officer held 
First American jointly and severally "liable for the acts of 
Wolf by virtue of its status as guarantor." Id. at *23.

 First American appealed to the Commission, raising three 
arguments: (1) that the CFTC regulation providing for guar-
antor status was contrary to congressional intent and thus 
invalid; (2) that the regulation was void for lack of proper 
notice under the Administrative Procedure Act (APA); and 
(3) that an exculpatory clause in a contract Violette signed 

__________
 4 Introducing Brokers who register under this option are 
known as "Guaranteed Introducing Brokers." See 48 Fed. Reg. at 
35,260.

 5 In 1996, citing inflation, the CFTC raised the floor from 
$20,000 to $30,000. See 61 Fed. Reg. 19,177, 19,183 n.31 (1996).

with First American overrode the guarantee agreement. The 
Commission ruled against First American on all three claims 
and affirmed the decision of the Judgment Officer. See 
Violette, 1999 WL 92428, at *1. Pursuant to 7 U.S.C. s 18(e), 
First American petitions this court for review of the Commis-
sion's order.

 II

 First American's initial claim is that the CFTC's final rule, 
which sets forth minimum capital requirements and permits 
the alternative of a guarantee agreement, contravenes the 
1982 Act. Our analysis of an agency's interpretation of a 
statute is guided by the two-step framework of Chevron 
U.S.A. Inc. v. NRDC, 467 U.S. 837, 842-43 (1984). We first 
ask "whether Congress has directly spoken to the precise 
question at issue," in which case we "must give effect to the 
unambiguously expressed intent of Congress." Id. If the 
"statute is silent or ambiguous with respect to the specific 
issue," however, we move to the second step and must defer 
to the agency's interpretation as long as it is "based on a 
permissible construction of the statute." Id. at 843.

 First American raises only a Chevron step one argument, 
contending that the guarantee provision is "contrary to the 
express intent of Congress." First American Br. at 7. We 
can perceive no such express intent. The 1982 Act authorizes 
the CFTC to issue regulations prescribing "minimum finan-
cial requirements" to ensure that an introducing broker 
meets "his obligations as a registrant." 7 U.S.C. s 6f(b). 
The statute is silent as to what such a financial requirement 
might be, and certainly does not say that the CFTC may not 
use an FCM's guarantee in satisfaction of that requirement. 
Instead, "Congress has explicitly left a gap for the agency to 
fill" and has made "an express delegation of authority to the 
agency to elucidate [the] specific provision of the statute by 
regulation." Chevron, 467 U.S. at 843-44. We therefore 
proceed to Chevron's step two.

 Although First American does not address the second step 
of Chevron, the CFTC does and we find its analysis compel-

ling. The question is whether the combination of a net 
capital requirement, supplemented with the alternative of a 
guarantee, reasonably falls within the undefined term, "mini-
mum financial requirements." The CFTC responds that the 
statute authorizes it to impose such requirements to insure 
that an introducing broker can meet "his obligations as a 
registrant," and the Commission reasonably explains that the 
guarantee alternative is, like the capital requirement, a way 
of: "(1) Insuring that introducing brokers are not judgment 
proof; and (2) providing coverage for potential liabilities of 
introducing brokers arising from business operations and 
customer relations." 48 Fed. Reg. at 35,264.

 Recognizing the absence of support for its position in the 
statutory language, First American asks us to retrace our 
Chevron steps and reconsider step one by looking at the 
legislative history of the 1982 Act. That history, appellant 
contends, expressly bars the guarantee provision at issue 
here. In support, First American cites the passage in the 
Senate Report stating that the Committee felt it would be 
inappropriate "to require" introducing brokers to become 
branch offices of FCMs, or "to impose" vicarious liability on 
FCMs for acts of introducing brokers. S. Rep. No. 97-384, at 
41. First American contends that the guarantee provision is 
inconsistent with this congressional concern, arguing that it 
effectively requires an introducing broker to become a branch 
office of its affiliated FCM, and effectively imposes vicarious 
liability on an FCM for the conduct of its affiliated introduc-
ing broker.

 The flaw in this argument is that the guarantee provision 
does not "require" or "impose" anything: it is merely an 
option that either the introducing broker or the FCM is free 
to reject. Rather than seek out an FCM for a guarantee, an 
introducing broker may instead choose to satisfy the capital 
requirement itself. And an FCM asked by an introducing 
broker for a guarantee may simply decline, electing instead to 
use its own employees or to work with introducing brokers 
that can independently satisfy the capital requirement. Ac-
cordingly, under the CFTC's regulation, the FCM's accep-
tance of liability through the guarantee is a voluntary choice, 

which nothing in the legislative history precludes the CFTC 
from making available.

 But, First American protests, the guarantee provision is 
not truly an option. In petitioner's view, the CFTC's $20,000 
minimum capital requirement is so high that introducing 
brokers are effectively "forced" to sign guarantee agree-
ments. It is this reality that assertedly contravenes both the 
Senate Committee's distaste for imposing obligations upon 
FCMs, and the Conference Report's contemplation "that the 
Commission will establish financial requirements which will 
enable [introducing brokers] to remain economically viable." 
H.R. Conf. Rep. No. 97-964, at 41.

 We see nothing in the statute or legislative history, howev-
er, that would foreclose a $20,000 minimum capital require-
ment as "too high." Both are silent on the question of what 
the "minimum" in "minimum financial requirements" means. 
Moving again to Chevron's step two, we also see no ground 
upon which the CFTC's standard could be viewed as an 
impermissible interpretation of that term, or even of the 
conferees' phrase, "economically viable." The CFTC original-
ly proposed an effective requirement of $37,500, cutting it 
almost in half to $20,000 after considering industry comments. 
First American has offered no evidence whatsoever to sub-
stantiate its claim that a $20,000 requirement is still too high 
to allow introducing brokers to remain economically viable, or 
that it is so high as to force them to opt for an FCM 
guarantee.6

__________
 6 The CFTC acknowledged that the SEC had established a 
lower minimum net capital requirement ($5,000) for securities intro-
ducing brokers. It explained, however, that a securities introducing 
broker is required to maintain the higher of $5,000 or 62/3% of 
aggregate indebtedness, "which could require such a firm to main-
tain more than $25,000 of net capital." 48 Fed. Reg. at 14,934 n.13. 
The CFTC also noted that its higher base amount was necessary 
"because introducing brokers in commodities will have fewer re-
strictions on their activities than is the case for securities introduc-
ing brokers." Id. at 14,942-43.

 Moreover, although it is true that the legislative history 
reflects congressional concern that the economic viability of 
introducing brokers be maintained, it also reflects Congress' 
intent--as the statute itself says--that the financial require-
ments be set at a level that will ensure that an introducing 
broker meets "his obligations as a registrant." 7 U.S.C. 
s 6f(b). The Commission was instructed to impose standards 
sufficient "to guarantee accountability and responsible con-
duct," S. Rep. No. 97-384, at 41, and to ensure "that persons 
handling orders for commodity trades cannot escape responsi-
bility for their actions for lack of adequate capital," id. at 112. 
Implementing this congressional intent was precisely the 
rationale the CFTC offered for finally settling upon a mini-
mum requirement of $20,000. See 48 Fed. Reg. at 35,261, 
35,264. And First American offers no basis for concluding 
that such a requirement is too high to be reasonably related 
to the goal of ensuring that customers' claims are not ren-
dered moot because introducing brokers are judgment proof. 
If anything, the more than $13,000 in damages awarded in the 
relatively small case now before us suggests that the facts are 
to the contrary.

 In sum, we conclude that the $20,000 minimum capital 
requirement for introductory brokers is a permissible exer-
cise of the CFTC's regulatory authority, and that it is equally 
permissible for the Commission to provide the alternative of 
entering into a guarantee agreement with an FCM. Indeed, 
providing such an option is faithful to Congress' direction that 
the CFTC "provide the registrants with substantial flexibility 
as to the manner and classification of registration." H.R. 
Conf. Rep. No. 97-964, at 41.

 III

 First American's second challenge to the CFTC's rule is 
procedural. Petitioner contends that the guarantee option 
should be invalidated because it was not subject to notice and 
comment prior to final issuance. As we have discussed, the 
notice of proposed rulemaking issued by the CFTC on April 
6, 1983, stated that the Commission was contemplating a 

$25,000 capital requirement, which, when combined with the 
proposed "early warning" requirement, would effectively re-
quire a minimum capital level of $37,500. The possibility of a 
guarantee option, later offered in the final rule, was not 
mentioned. Petitioner contends that this failure to publish 
notice of the guarantee option violated the APA, which gener-
ally requires an agency to give at least thirty days notice of 
and an opportunity to comment on "either the terms or 
substance of the proposed rule or a description of the subjects 
and issues involved." 5 U.S.C. s 553(b); see id. s 553(c), (d).

 The law does not require that every alteration in a pro-
posed rule be reissued for notice and comment. If that were 
the case, an agency could "learn from the comments on its 
proposals only at the peril of" subjecting itself to rulemaking 
without end. International Harvester Co. v. Ruckelshaus, 
478 F.2d 615, 632 & n.51 (D.C. Cir. 1973); see Fertilizer Inst. 
v. EPA, 935 F.2d 1303, 1311 (D.C. Cir. 1991); American 
Medical Ass'n v. United States, 887 F.2d 760, 768 & n.7 (7th 
Cir. 1989). Instead, renewed notice is required only if the 
final rule cannot fairly be viewed as a "logical outgrowth" of 
the initial proposal. Small Refiner Lead Phase-Down Task 
Force v. EPA, 705 F.2d 506, 547 (D.C. Cir. 1983). The test 
for a "logical outgrowth," variously phrased, is whether a 
reasonable commenter "should have anticipated that such a 
requirement" would be promulgated, id. at 549, or whether 
the notice was "sufficient to advise interested parties that 
comments directed to the" controverted aspect of the final 
rule should have been made, Fertilizer Inst., 935 F.2d at 
1312.

 In this case, the outcome of that test is a relatively close 
question. As we have said above, the guarantee agreement is 
reasonably regarded as a form of minimum financial require-
ment, and was promulgated in response to suggestions that it 
be offered as an alternative to the $25,000 capital requirement 
originally proposed. The fact that others in First American's 
shoes--that is, other FCM's--did comment on and indeed 
propose the guarantee option suggests that they, at least, 
regarded it as a logical outgrowth. See Comments of Abram-
son & Fox at 6 (proposal by law firm "retained by several 

major futures commission merchants" that "the carrying 
FCM be permitted to assume full regulatory and financial 
responsibility for the activities of the introducing broker"); 
Comments of Heinold Commodities, Inc. at 2 (proposal by 
registered FCM that, as an alternative to a capital require-
ment, the carrying FCM should be permitted to "stand as a 
guarantor for the introducing broker's potential liabilities"); 
Comments of Cargill Investor Services, Inc. at 1 (suggesting 
that as long as "the FCM remains fully responsible to the 
customer, there is no reason for [introducing brokers] to 
fulfill a capital requirement" ). On the other hand, it could 
well be argued that a reasonable commenter would not have 
thought to comment on a guarantee option since it is different 
not only in degree but in kind from a financial requirement 
denominated in dollars. Under that view, the connection 
between the original notice and the guarantee option would 
be "simply too tenuous" for the latter to be regarded as a 
"logical outgrowth" of the former. Small Refiner, 705 F.2d 
at 549.

 We need not resolve this question, however, because 
CFTC's failure to re-notice the guarantee option was at best 
harmless. The APA directs reviewing courts to take "due 
account" of "the rule of prejudicial error." 5 U.S.C. s 706. 
"As incorporated into the APA, the harmless error rule 
requires the party asserting error to demonstrate prejudice 
from the error." Air Canada v. DOT, 148 F.3d 1142, 1156 
(D.C. Cir. 1998) (citing 5 U.S.C. s 706); see Steel Mfrs. Ass'n 
v. EPA, 27 F.3d 642, 649 (D.C. Cir. 1994) (acknowledging 
agency's failure to provide opportunity for comment on one 
portion of a rule, but upholding the rule under APA's "harm-
less error" provision); Cabais v. Egger, 690 F.2d 234, 237 n.4 
(D.C. Cir. 1982) ("Even where notice and comment were 
erroneously omitted, a regulation or rule need not be invali-
dated if it has no substantial impact."). Assuming that the 
notice provided by the CFTC was insufficient, we conclude 
that First American suffered no prejudice as a result.

 As we have discussed above, the portion of the rule to 
which First American objects is merely an alternative to the 
primary compliance requirement of maintaining $20,000 in net 

capital. That primary requirement is perfectly lawful, and 
one upon which First American did have an opportunity to 
comment. First American was not required to accept the 
guarantee alternative; it was free to turn Wolf away and 
instead to use its own employees or to deal only with intro-
ducing brokers who could meet the capital requirement. 
That First American did not do so evidences its view either 
that the guarantee was not harmful, or that it was less 
harmful than the primary requirement by which it would 
otherwise have had to abide. The lack of opportunity to 
comment on the guarantee option therefore cannot be cause 
for overturning the CFTC's regulation.

 We also note that the concept of a guarantee option came 
from FCMs looking for a way to give both their introducing 
brokers and themselves an alternative to the minimum capital 
requirement. This indicates that FCMs regarded the guar-
antee as an alternative that was beneficial rather than harm-
ful to their interests. Although First American is not bound 
by the views of its fellow FCMs, its own voluntary decision to 
adopt the guarantee option makes clear that it regarded it the 
same way. This reinforces the conclusion that the CFTC's 
failure to extend the rulemaking to provide an opportunity for 
notice and comment on the guarantee option was at best 
harmless error.

 Finally, the fact that First American not only was not 
harmed by, but rather affirmatively benefitted from, the 
availability of the guarantee option suggests a second reason 
for not countenancing its claim of procedural error. Under 
the doctrine of equitable estoppel, "a party with full knowl-
edge of the facts, which accepts the benefits of a transaction, 
contract, statute, regulation, or order may not subsequently 
take an inconsistent position to avoid the corresponding obli-
gations or effects." Kaneb Servs., Inc. v. FSLIC, 650 F.2d 
78, 81 (5th Cir. 1981). Here, the CFTC gave First American 
the option of guaranteeing the liabilities of Wolf, an introduc-
ing broker who could not otherwise have operated for lack of 
sufficient capital. First American had no obligation to make 
the guarantee, but did so in exchange for the financial bene-
fits both entities expected to reap from their joint arrange-

ment. Having received those benefits, First American will 
not now be heard to attack the regulation that was their 
source. See Federal Power Comm'n v. Colorado Interstate 
Gas Co., 348 U.S. 492, 502 (1955) ("[Respondent] cannot now 
be allowed to attack an officially approved condition of the 
merger while retaining at the same time all of its benefits.").

 IV

 First American's final challenge to the order holding it 
liable for the conduct of its introducing broker is based on an 
exculpatory clause included in an agreement that Violette 
signed with First American after Wolf introduced the two. 
Paragraph 23 of the two-page, standard-form "Customer 
Agreement" reads as follows: "Customer hereby waives any 
claim based upon First American's guarantee, if any, of 
Introducing Broker's obligations under the Commodity Ex-
change Act or CFTC regulations." J.A. at 27. First Ameri-
can argues that this provision immunizes it from liability that 
would otherwise attach under the guarantee agreement it 
signed with its introducing broker.

 The CFTC disagrees. It states that its Regulation 1.10(j), 
17 C.F.R. s 1.10(j), which permits an introducing broker to 
satisfy its capital requirements through an FCM guarantee, 
cannot be waived in this manner. Whether or not an agen-
cy's regulation is waivable is a question of the agency's intent, 
and just as we must defer to the agency's reasonable inter-
pretation of the statutory scheme it was entrusted to adminis-
ter, so too must we give its interpretation of its own regula-
tion "controlling weight unless it is plainly erroneous or 
inconsistent with the regulation." Bowles v. Seminole Rock 
& Sand Co., 325 U.S. 410, 414 (1945); see Christensen v. 
Harris County, 120 S. Ct. 1655, 1663 (2000); Auer v. Robbins, 
519 U.S. 452, 461 (1997).

 The CFTC's interpretation of its regulation as non-waivable 
is neither plainly erroneous nor inconsistent with the regula-
tion. Nothing in the text of the rule suggests that the 
guarantee is waivable. To the contrary, the mandatory form 
agreement required by the rule states: "This guarantee 

agreement is binding and is and shall remain in full force and 
effect unless terminated in accordance with the rules, regula-
tions or orders promulgated by the Commission with respect 
to such terminations." CFTC Form 1-FR-IB (Part B); see 
17 C.F.R. s 1.3(nn) (requiring guarantee to conform to Form 
1-FR).7 Under the regulations, termination is permitted 
(with prospective effect only) by mutual written consent of 
the parties with prompt notice to the Commission, or by 
either party with written notice to the other and to the 
Commission. See 17 C.F.R. s 1.10(j)(5)(iii). The rules do not 
permit termination by waiver of a customer, and First Ameri-
can does not argue that the events which do permit termi-
nation occurred in this case.

 Moreover, the CFTC contends that permitting customer 
waiver would "undermine[ ] the protections provided by the 
guarantee agreement." Violette, 1999 WL 92428, at *2. The 
purpose of the Commission's rule is to provide coverage for 
the liabilities of introducing brokers and to ensure that they 
are not "judgment proof." 48 Fed. Reg. at 35,264. The 
CFTC reasonably argues that if the guarantee were waiva-
ble--particularly through the kind of boilerplate contract at 
issue here--that purpose would be wholly defeated. See 
Gray v. American Express Co., 743 F.2d 10, 16 (D.C. Cir. 
1984) (declining to give effect to provision in cardmember 
contract that would have effectively waived coverage of Fair 
Credit Billing Act); id. at 16 ("The rationale of consumer 
protection legislation is to even out the inequalities that 
consumers normally bring to the bargain. To allow such 
protection to be waived by boiler plate language of the 
contract puts the legislative process to a foolish and unpro-
ductive task.").

__________
 7 See also 48 Fed. Reg. at 35,265 ("If the guarantee agreement 
does not expire or is not terminated in accordance with the provi-
sions of s 1.10(j)(4) or (5), it shall remain in effect indefinitely."). 
Guarantee agreements can expire (with prospective effect only) if 
the FCM or introducing broker fails to renew its registration of if 
such registration is suspended, revoked, or withdrawn. See 17 
C.F.R. s 1.10(j)(4)(i)-(ii).

 Finally, and perhaps most telling, even if we were to hold a 
guarantee agreement waivable by a customer, not even First 
American contends that the CFTC's minimum capital require-
ment would itself be waivable in that manner. See 7 U.S.C. 
s 6f(b) (providing that each registered introducing broker 
"shall at all times continue to meet" the minimum financial 
requirements prescribed by the Commission). Yet, to hold 
the one is to hold the other. As the rules make clear, a 
guarantee agreement is entered into "in satisfaction of the 
adjusted net capital requirements with which the introducing 
broker otherwise would have to comply," and thus permits 
the introducing broker to operate below the minimum level of 
required net capital. CFTC Form 1-FR-IB (Part B); see 17 
C.F.R. s 1.3(nn). Although First American argues that the 
guarantee may be waived, it does not suggest that the CFTC 
may thereafter deregister the introducing broker if it cannot 
muster $20,000 in capital. But if the Commission cannot 
deregister such a broker, permitting waiver would effectively 
permit the broker to slip the bonds of the capital requirement 
altogether. The CFTC reasonably interprets its regulations 
as not countenancing such blatant circumvention of their 
purpose.

 First American complains that even if the CFTC's no-
waiver interpretation is correct, allowing the Commission to 
apply it for the first time in this adjudication would be unfair.8 
We do not agree. There is nothing in the language of the 
regulation to suggest to a reasonable FCM that guarantees 
are waivable, and the termination provision suggests quite the 
opposite. Court decisions dating back to at least 1991, five 
years before Violette signed the waiver at issue here, hold 
that waiver agreements purporting to invalidate identical 
guarantee agreements are unenforceable as contrary to the 
purpose of the statutory and regulatory framework. See, e.g., 
Skipper v. Index Futures Group Inc., No. 91C1624, 1995 

__________
 8 This is actually the second case in which the CFTC has so 
ruled. The CFTC issued its first opinion on the subject a month 
earlier. See Clemons v. McCabe, CFTC Doc. No. 97-R053, 1999 
WL 46833, at *2 (Jan. 29, 1999).

WL 493435 (N.D. Ill. 1995); Resolution Trust Corp. v. 
Krantz, No. 89C166, 1991 WL 148291 (N.D. Ill. 1991).9 
Moreover, even if it were unfair for the CFTC only now to 
make clear that the regulatory requirement cannot be waived, 
it would be at least as unfair to Violette to announce the 
opposite rule. Indeed, we cannot help but note the irony in 
petitioner's claim that Violette--a retired postal worker--
"voluntarily" entered into the boilerplate waiver agreement 
with First American, while First American itself--a large 
brokerage firm--was simultaneously "compelled" to enter 
into the guarantee agreement with Wolf.10

 V

 We uphold the validity of the regulation permitting guaran-
tee agreements as alternatives to minimum capital require-
ments, and further uphold the CFTC's interpretation of that 
regulation as not permitting customer waivers. Accordingly, 
we have no ground for reversing the Commission's order 
holding First American jointly and severally liable for the 

__________
 9 First American cites two cases in which it contends courts 
upheld exculpatory waiver provisions in contracts between FCMs 
and customers. See Rothwell Cotton Co. v. Rosenthal & Co., 827 
F.2d 246, 250-51 (7th Cir. 1987); Cange v. Stotler and Co., 826 F.2d 
581 (7th Cir. 1987); id. at 596 (Easterbrook, J., concurring). In 
neither case, however, was there a guarantee agreement between 
an FCM and an introducing broker, and hence in neither was the 
waivability of the CFTC's regulation at issue. See Cange, 826 F.2d 
at 596 (Easterbrook, J., concurring) (arguing that waivers should 
generally be upheld "[u]nless ... the CFTC forbids them by 
regulation"). Moreover, in Cange the majority opinion suggested 
that an exculpatory waiver provision signed prior to the initiation of 
trading would not be enforceable. See 826 F.2d at 594-95.

 10 We also note that First American has an indemnification 
agreement with Wolf that will permit it to recover from the 
introducing broker in the event it is held liable for the latter's 
wrongdoing. See Letter from Counsel for First American (Jan. 20, 
2000). CFTC regulations authorize such indemnification agree-
ments. See 48 Fed. Reg. at 35,264.

regulatory violations committed by its introducing broker. 
The petition for review is denied.

 Randolph, Circuit Judge, concurring: I concur in the 
judgment and in all of the court's opinion except the portion 
of Part III holding that the Commission's failure to give 
notice amounted to harmless error.